**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JANET AREVALO,                     )
                                   )
              Plaintiff,           )     Case No. 09-CV-1753
        v.                         )
                                   )     Magistrate Judge
MICHAEL J. ASTRUE,                 )     Arlander Keys
Commissioner of Social Security    )
                                   )
              Defendant.           )

### MEMORANDUM OPINION AND ORDER

Plaintiff, Janet Arevalo, moves this court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security ("Commissioner"), who denied her
claim for Disability Insurance Benefits ("DIB"). Defendant
Commissioner has filed a Cross-Motion for Summary Judgment. For
the reasons set forth below, the Court denies Plaintiff's Motion
for Summary Judgment and grants the Commissioner's Cross-Motion
for Summary Judgment.

### PROCEDURAL HISTORY

Janet Arevalo applied for DIB on December 24, 2003, alleging
a disability onset date of January 14, 2000[1]. R. 99. The Social
Security Administration ("SSA") denied Ms. Arevalo's claim on
June 10, 2004, and upon reconsideration on January 10, 2005. R.
53-56, 58-62. Ms. Arevalo subsequently requested a hearing

---

[1] At her hearing before the ALJ, Ms. Arevalo asserted an alleged disability
onset date of January 4, 2000. R. 368.

before an Administrative Law Judge ("ALJ"). R. 28. A hearing was held on September 28, 2007, before ALJ James Gildea, in Peru, Illinois. R. 366. The ALJ issued a decision on November 20, 2007, denying Ms. Arevalo's claim for benefits, finding that Ms. Arevalo could perform a significant number of jobs that existed in the economy, including employment as a pharmaceutical packager, escort vehicle driver, or novelty assembler. R. 41. ALJ Gildea's decision became the final agency decision when the Appeals Council denied Ms. Arevalo's Request for Review on February 20, 2008. R. 25. The Appeals Council subsequently set aside this decision to consider additional information Ms. Arevalo had supplied, then again denied her Request for Review on February 4, 2009. R. 4.

Ms. Arevalo filed this lawsuit on May 5, 2009, seeking review of the Agency's decision and an award of benefits. Compl. 2. The case was initially assigned to Judge John A. Nordberg, in the Northern District of Illinois. The parties consented to proceed before a magistrate judge, and the matter was reassigned to this Court on October 6, 2009. Both parties moved for summary judgment. Ms. Arevalo asks the Court to vacate the ALJ's decision and remand the case for further proceedings.

## FACTUAL BACKGROUND

### Testimony at Hearing

At the hearing on September 28, 2007, ALJ Gildea heard from Plaintiff Janet Arevalo and Ronald Malik, a Vocational Expert ("VE"). R. 366.

A.   *Testimony of the Plaintiff*

Upon examination by the ALJ, Ms. Arevalo testified that she had last worked as a parts cleaner for Professional Maintenance Company, a Caterpillar contractor. R. 157, 374. Ms. Arevalo injured her back at work as she lifted a large box in January of 2000. R. 375-76. She was taken to the hospital, where she was examined, given pain medication, and sent home. R. 377. She testified that, despite physical therapy, she had problems with pain and incontinence. R. 378. An MRI revealed a herniated disc in her back, and doctors performed a discectomy and interbody fusion in June of 2000. R. 378, 394. Ms. Arevalo testified that she performed physical therapy, which initially eased her pain, but she later began to feel worse. R. 380. Ultimately, her body rejected the fusion and her doctors recommended further surgery, which Ms. Arevalo purportedly did not undergo for lack of insurance. R. 381.

Since her accident, Ms. Arevalo has experienced a variety of pain. In addition to chest pain that leaves her short of breath, her legs swell and she has difficulty walking. R. 381-82. She testified that she has prescription pain medication and water pills to reduce swelling, but admits that she cannot always afford to purchase them. R. 382. She described the pain in her middle to upper back region as "needles and pins" that shoot down her legs and out her toes. R. 385-86, 398-99. She has never used a cane, walker, or wheelchair. R. 384. Ms. Arevalo testified that her incontinence did not improve with surgery. R.

3

395-96.   Triggered by coughing or lifting objects, this condition requires the use of eight to twelve adult diapers per day, which she changes almost hourly.   R. 396-97.

Ms. Arevalo testified that she had been in a car accident in December of 2006.   R. 384.   Although her doctors recommended surgery to repair the damage to her upper back, Ms. Arevalo had not yet undergone surgery at the time of the hearing.   R. 383-84. Since the accident, she has had headaches approximately four times per week that can last all day, as well as increased arm pain.   R. 399, 403-04.   When asked if she is ever pain free, Ms. Arevalo answered no.   R. 400.

At the time of the hearing, Ms. Arevalo was forty-seven years old and had not worked since her physical therapy.   R. 373, 386.   She completed eight years of school, but has difficulty with reading and spelling.   R. 373.   She lives with her husband – who is unemployed and receives disability benefits – in a house they own.   R. 370-71, 382-83.   Ms. Arevalo explained that her pain limits her ability to do basic chores.   R. 389-401.   She testified that she does not cook, do laundry or clean the house; instead, her husband and son perform these tasks.   R. 390-93. Activities that require her to bend over – such as dressing or bathing – cause her pain and require extra time to complete.   R. 392, 401. She testified that she only drives in emergency situations or if she travels the one mile distance to visit her 84-year-old mother.   R. 394.   Ms. Arevalo wakes up at 9:00 or 10:00 a.m. and spends most of her day watching television,

alternating between positions on the couch and chair to relieve her pain. R. 387, 391-92. She testified that the pain also prevents her from falling asleep at night, keeping her awake until 3:00 or 4:00 in the morning.

B. *Testimony of the Vocational Expert*

At the hearing, VE Ronald Malik characterized Ms. Arevalo's material handler position as semiskilled and heavy demand; her parts cleaner position as unskilled and medium demand; her sewing machine operator position as unskilled and light demand; and her electronic assembler position as unskilled and light demand. R. 405.

The ALJ asked Mr. Malik about a hypothetical individual with limited education who could stand or walk up to two hours out of an eight-hour-day or sit up to six hours out of an eight-hour-day with normal breaks; lift less than ten pounds frequently and ten pounds occasionally; and only occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs, but never climb ladders, ropes, or scaffolds. R. 405-06. Mr. Malik responded that, although the individual could not perform Ms. Arevalo's past relevant work, other work was available to the hypothetical individual, including: pharmaceutical packager, escort vehicle driver, and novelty assembler. R. 405-06. Ms. Arevalo's attorney asked Mr. Malik to consider the same individual needing twenty-minute breaks each hour, which Ms. Arevalo testified her incontinence demands. Mr. Malik stated that "the person would have a difficult time meeting the productivity standards." R. 407.

When asked to speculate about the same individual requiring two unexcused absences per week, Mr. Malik testified that there would be no such jobs available. R. 408.

**Medical Evidence**

In January of 2000, Ms. Arevalo injured her back while lifting a fifty-pound box at work. R. 157. Emergency room tests revealed no fractures and she returned home the same day[2]. R. 157. Two weeks later, Ms. Arevalo experienced a "blow-out sensation" in the middle of her back, which set off pain radiating down her back and left leg. R. 195. She began physical therapy in the month following her accident, yet reported an increase in pain. R. 195. She described the pain as constant and burning, occasionally causing numbness in her legs. R. 195.

A. *Treating Physicians*

Dr. Dzung Dinh, a neurologist, examined Ms. Arevalo in June of 2000. R. 195. He found symmetrical reflexes, "5/5" strength, and intact sensation. R. 195. But a review of an MRI performed in May of 2000, revealed a "sizeable T7-8 disc herniation." R. 195. Attributing her pain to this ruptured disc, Dr. Dinh recommended surgery. R. 195-96. On June 28, 2000, Ms. Arevalo underwent surgery for a T7-8 discectomy and interbody fusion. R. 191-92. One month after he performed this surgery, Dr. Dinh reported that Ms. Arevalo's burning pain had improved. R. 194.

---

[2] There is no record of Ms. Arevalo's emergency room visit, but Dr. Dinh provides a summary of that visit in June of 2000. R. 157.

However, she reported increased neck and back pain, and occasional tingling in the left arm and fingers. R. 194. Her surgical incision had healed well and she demonstrated "5/5" strength, leading Dr. Dinh to recommend a combination of pain medication and aquatic therapy. R. 194. At a follow-up visit in September of 2000, Ms. Arevalo described a stabbing pain around the incision. R. 186. She described her inability to sleep at night and revealed a "significant amount" of stress due to personal problems at home. R. 186. Dr. Dinh concluded her pain was stress-related and recommended she continue her treatment with new pain medication. R. 186.

In November of 2000, Dr. Dinh indicated that Ms. Arevalo continued to heal well, despite constant pain around the incision and lower back. R. 184. Still, Dr. Dinh hoped to release her to "light duty with a ten pound restriction" by the following month. R. 184. Yet, in February of 2001, Dr. Dinh noted that Ms. Arevalo was discharged from physical therapy due to her lack of progress. R. 182. She rated her mid-back pain as "6/10" and her lower back pain as "8/10." R. 182. He gave Ms. Arevalo new medication to relieve her pain and recommended that she conduct swimming exercises on her own. R. 182.

Two months later, Dr. Thomas Szymke, a specialist in rehabilitation medicine, examined Ms. Arevalo. R. 180-81. He noted her "persistent aching in the lumbosacral region" and that pain and numbness continued to radiate throughout her lower body.

R. 180. Ms. Arevalo told Dr. Szymke that she was off all of her medications, except for the occasional dose of Vicodin. R. 181. Still, Dr. Szymke described her neurological exam as "quite unremarkable" and noted "5/5" strength and good reflexes. R. 182. Dr. Szymke sent Ms. Arevalo home with a new therapy plan to ease her pain and "rigorously mobilize her." R. 182. In a follow-up visit in June of 2001, Dr. Szymke noted that her physical therapy at Champion Fitness and Human Performance Institute alleviated her discomfort – despite interruptions in treatment due to Ms. Arevalo's health and court appearances. R. 178. The doctor also stated that Ms. Arevalo's stress is "quite provocative with regard to her pain." R. 178. Although Ms. Arevalo is "anxious to return back to work," Dr. Szymke observed that her work may require modification, since assuming her former lifting assignments could be "problematic." R. 178.

In July of 2001, Dr. Dinh observed "5/5" strength and well-performed back and side extensions. R. 176. In response to her complaints of lower back pain and tenderness, Dr. Dinh recommended continued physical therapy and new additions to her medication regimen. R. 176. A few days later, Dr. Szymke observed that Ms. Arevalo's persistent pain appeared "to be far in excess of her physical findings" and described her neurological exam as "unremarkable." R. 175. He characterized her progress as "excruciatingly slow" and wrote that Ms. Arevalo needs to "push a lot harder" if she wants to address her pain and

develop her strength for employment. R. 174-175. One month later, Dr. Szymke observed increased strength and flexibility when Ms. Arevalo was able to bend over and touch the floor "without hesitation." R. 172. Yet, Dr. Szymke noted that, because Ms. Arevalo was a normally hyperlimber individual, she had more progress to make. R. 172.

At her September 13, 2001 appointment, Dr. Szymke discovered that Ms. Arevalo had attended six of twenty-two scheduled physical therapy visits. R. 168. He opined that the lack of compliance with her physical therapy program meant that Ms. Arevalo was "not suffering terribly." R. 168. He decided to release her back to work without restriction as of October 15, 2001. R. 168. Dr. Szymke ended his report with the statement that Ms. Arevalo "has had more than sufficient time to recover from a simple decompression and I truly am disappointed with her lack of compliance." R. 169. One month later, Dr. Szymke learned that Ms. Arevalo had attended only seven of nineteen scheduled physical therapy visits since her last appointment with him. R. 167. Given her unremarkable neurological exam and her ability to bend and touch her toes, Dr. Szymke wrote that he had "no objective measure to substantiate her substantial complaints and I think she should be back to work without restrictions." R. 167. A few days later, Dr. Dinh found no clinical evidence to disagree with Dr. Szymke's assessment. R. 166.

Two months later, in December of 2001, Dr. Dinh described Ms. Arevalo's pain as predominantly musculoskeletal in nature, but acknowledged some "magnification" of her symptoms. R. 165. Since his last assessment, Ms. Arevalo had ceased using any of her medication, gained 30 pounds, and had become "very depressed." R. 165. She returned to work, but worked only two days before quitting. R. 157, 165. Dr. Dinh placed Ms. Arevalo on medication and restarted her physical therapy. R. 165.

In February of 2002, Dr. Dinh referred Ms. Arevalo to Dr. Lisa Snyder, a Physical Medicine and Rehabilitation physician, for further treatment and evaluation. R. 159. In March of 2002, Dr. Snyder noted Ms. Arevalo's persistent pain in her back and lower body. R. 157. Dr. Snyder described the physical examination as unremarkable and attributed Ms. Arevalo's occasional incontinence to stress. R. 157-58. Dr. Snyder recommended a pool therapy program and regimen of pain medication. R. 158.

One year later, Dr. Ronald Michael diagnosed Ms. Arevalo with thoracic postlaminectomy syndrome and recommended a conservative treatment of thoracic epidural steroid injections. R. 306. On June 19, 2003, Radiologist Mark Hilborn conducted an MRI and found that, while the remainder of the thoracic spine was within normal limits, there was a "mild deformity involving the right pedicle of the T7 vertebral body with extension into the posterior aspect of the posterolateral aspect of the T7 vertebral

body." R. 260. The next month, Ms. Arevalo saw Dr. Frank Mikell for chest pain and shortness of breath. R. 208. Dr. Mikell performed a diagnostic cardiac catheterization on Ms. Arevalo, with normal results. R. 211. Still, Dr. Mikell strongly advised Ms. Arevalo to lose weight, engage in regular physical activity, and stop smoking. R. 207.

On August 2, 2003, Dr. Michael indicated that his conservative treatment plan had not worked and recommended a posterior thoracic fusion. R. 303. He acknowledged that she had been off of work for some time and "should be until after recovery." R. 303. In November of 2003, Dr. Michael indicated he could perform Ms. Arevalo's fusion surgery, but required payment approval from Workers' Compensation[3]. R. 302.

B. *Consulting Physician*

In June of 2001, Ms. Arevalo's attorney asked Dr. Robert Eilers to evaluate Ms. Arevalo. R. 332-35. Dr. Eilers found that Ms. Arevalo's work injury on January 14, 2000 resulted in her T7-8 thoracic disc herniation and "severe myofascial pain syndrome." R. 334. According to Dr. Eilers, Ms. Arevalo's medical care and costs to date were reasonable and appropriate. R. 334. Further, Dr. Eilers did not see Ms. Arevalo returning to competitive employment, but opined she may be able to perform a "light sedentary desk job" with proper training. R. 335.

---

[3] Ms. Arevalo had received Workers' Compensation benefits until they ended on September 1, 2002. R. 99.

Dr. Eilers evaluated Ms. Arevalo again in January of 2004. R. 336-38. He indicated that her medical care and costs to date were reasonable, agreed with Dr. Michael's recommendation for surgery, and determined that she was not able to return to competitive employment until resolution of her pain issues. R. 338. In February of 2004, Ms. Arevalo's primary physician, Dr. Glen Ricca, noted that Ms. Arevalo sought disability to pay for Dr. Michael's recommended surgery. R. 298. He cited Dr. Michael's opinion that Ms. Arevalo suffered from postlaminectomy syndrome and gave his own opinion that she is disabled. R. 298.

On December 4, 2006, Ms. Arevalo was in an automobile accident, which aggravated her symptoms. R. 339-59. Two months later, an MRI revealed a herniated disc at C5-6 and Dr. Michael recommended a series of cervical epidural steroid injections. R. 358-59. On August 29, 2007, Dr. Eilers evaluated Ms. Arevalo and noted that her "multiple medical issues" would preclude her from gaining "competitive employment." R. 342. He described her limitations as "significant" and speculated that she will "continue with permanent disability." R. 343.

C. *State Agency Physicians*

On June 2, 2004, Dr. Henry Rohs, an SSA medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment and found that, while Ms. Arevalo had pain, she lacked any neurological problems. R. 289-96. Instead, Dr. Rohs found that Ms. Arevalo could occasionally lift ten pounds, frequently

lift less than ten pounds, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. R. 290. Also, she could occasionally climb, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes and scaffolding. R. 291. According to Dr. Henry Rohs, Ms. Arevalo did not meet or equal a listing for a disability. R. 296. The SSA examined an October 2004 letter from Dr. Ricca, in which he stated that Ms. Arevalo is disabled and could not hold "any significant job." R. 297. Dr. Michael Fernando, a state psychiatrist, conducted an examination of Ms. Arevalo in November of 2004, and determined that she "seemed capable of maintaining concentration, a stream of ideas and social connectedness which would correlate with an ability to establish and maintain social contact with others in a work environment." R. 310. In December of 2004, Dr. John Tomassetti completed a psychiatric review assessment, which revealed that Ms. Arevalo had no severe mental impairments. R. 311. On December 1, 2004, Dr. Aquino Calixto reviewed the medical evidence and affirmed Dr. Rohs's June 2004 medical findings. R. 325.

**The ALJ's Decision**

The ALJ determined that Ms. Arevalo had not been under a disability from January 4, 2000 to the present. R. 32. First, the ALJ found that Ms. Arevalo had not engaged in substantial gainful activity since her alleged onset date of January 4, 2000. R. 34. Next, the ALJ acknowledged that Ms. Arevalo suffers from

degenerative and discogenic disorders of the back, which are severe impairments. R. 34. However, the ALJ found that Ms. Arevalo's "depressive disorder" placed "no more than minimal limitations [on] her ability to perform basic work-related activities." R. 35. He relied on the opinions of the State Agency medical consultants to conclude that Ms. Arevalo did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. R. 35.

In assessing Ms. Arevalo's RFC, the ALJ determined that Ms. Arevalo retained the capacity to lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently; sit for six hours and stand and/or walk for two hours in an eight-hour workday; and balance, kneel, stoop, crouch, and crawl occasionally. R. 35.

The ALJ found Ms. Arevalo's statements "concerning the intensity, persistence and limiting effects of [her] symptoms … not entirely credible." R. 37. He relied on Dr. Szymke's observation of the lack of "objective medical measure[s] to substantiate her substantial complaints." R. 37. The ALJ also considered discrepancies between Ms. Arevalo's testimony that she did virtually no housework and Ms. Arevalo's earlier statements to doctors and the SSA that she did housework and took care of a grandchild. R. 38. The ALJ then pointed out Ms. Arevalo's failure to comply with her physical therapy and other medical advice, plus evidence that Ms. Arevalo received very little

treatment between 2004 and 2006. R. 38-9. This indicated to the ALJ that Ms. Arevalo's symptoms were not as serious as alleged. R. 39. Finally, the ALJ stated that Ms. Arevalo was evasive during the hearing about the amount she received as a settlement for her Workers' Compensation claim. R. 39.

The ALJ also gave little weight to Dr. Ricca's October 2004 opinion that Ms. Arevalo is disabled. R. 39. The ALJ explained that, despite Dr. Ricca's lengthy history with Ms. Arevalo, Dr. Ricca admitted that her objective medical findings were normal and that Ms. Arevalo did not comply with her physical therapy. R. 39. Further, the ALJ pointed out that Dr. Ricca was not qualified to opine on vocational issues, which are reserved for the Commissioner. R. 39. Similarly, the ALJ gave little weight to Dr. Eilers's opinion that Ms. Arevalo could not work more than five hours a day and would require the ability to sit and stand at will. R. 39. Not only did the ALJ find this opinion to be inconsistent with objective testing, but he also pointed to evidence that Ms. Arevalo worked after Dr. Eilers offered this opinion. R. 39-40.

The ALJ acknowledged that Ms. Arevalo could not perform her past relevant work. R. 41. However, based on VE Malik's testimony, the ALJ found that there are jobs in the local economy that Ms. Arevalo could perform. R. 41. During the 2007 hearing, Ms. Arevalo's attorney led Mr. Malik to concede that no jobs would be available if the hypothetical individual required

twenty-minute bathroom breaks each hour and two unexcused absences per week. R. 407-08. However, the ALJ afforded this testimony little weight, since the limitations cited by Ms. Arevalo were not substantially supported by the record. R. 41.

The ALJ concluded that Ms. Arevalo was not disabled under sections 216(i) and 223(d) of the Social Security Act. R. 41.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)). Should conflicting evidence permit reasonable minds to differ, it is the responsibility of the ALJ – not the courts – to determine if the claimant is disabled. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

While the ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002). Unless the ALJ fails to rationally articulate the grounds for his decision in a manner that permits meaningful review, the Court must affirm if there is substantial evidence supporting the ALJ's decision. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual seeking DIB must prove a disability under the SSA's five step inquiry. 20 C.F.R. § 404.1520. First, the ALJ establishes whether the individual is employed; second, the ALJ determines if the individual has a severe impairment; third, the ALJ decides if the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ ascertains the individual's RFC and whether she can perform her past relevant work; finally, the ALJ determines whether the individual is capable of performing work in the national economy.

## DISCUSSION

In support of her Motion for Summary Judgment, Ms. Arevalo argues that: the ALJ failed to (1) properly address the credibility of her testimony; (2) consider the opinions of Ms. Arevalo's treating and consulting physicians; and (3) consider

17

medical evidence favorable to Ms. Arevalo. Each of these arguments is considered in turn.

**The ALJ's Credibility Determination**

Ms. Arevalo contends that the ALJ improperly rejected her testimony as not entirely credible. An ALJ's credibility assessment is "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). An ALJ must weigh all credible evidence, but the law "does not compel an ALJ to accept wholly the claimant's perception of a disability." *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). The ALJ's determination will not be reversed "unless it is patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The Court does not review the medical evidence de novo, and will only declare the ALJ's determination patently wrong if it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Social Security Ruling 96-7p requires a credibility decision to "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (explaining that "a single, conclusory statement that

'the individual's allegations have been considered' or that 'the allegations are (or are not) credible'" is insufficient).

At her hearing, Ms. Arevalo testified that she is never free of pain. R. 400. She described back pain that shot down her legs, and day-long headaches as often as four times a week. R. 399-400. She claimed chest and arm pain, as well as swelling in her legs. R. 381-82, 403-04. She testified that she deals with incontinence triggered by coughing or lifting objects, and stated that she uses eight to twelve adult diapers per day. R. 395-96. Ms. Arevalo stated that her pain prevents her from cooking, doing laundry, or cleaning the house. R. 390-93. She finds it painful to bend while dressing or bathing. R. 392, 401. She drives only in emergency situations or for short distances. R. 394. She testified that her pain prevents her from falling asleep until the early morning hours, and when she is awake, she spends most of the day watching television and seeking positions to relieve her pain. R. 387, 391-92. The ALJ based his determination that Ms. Arevalo was not entirely credible with regard to the "intensity, persistence, and limiting effects of her symptoms" on a host of factors. R. 37.

First, the ALJ found that Ms. Arevalo's statements about her symptoms were not substantiated by her physicians' objective medical findings. The ALJ cited to Dr. Dinh's belief that Ms. Arevalo's symptoms were related to stress at home and to Dr.

Szymke's evaluation that there was "no objective measure to substantiate her substantial complaints." R. 37.

Ms. Arevalo argues that the ALJ erroneously considered only evidence prior to her June 2003 MRI, which revealed a mild deformity of the T7 vertebral body. R. 260. Ms. Arevalo contends that it was not until then that the medical evidence substantiated her persistent pain. The Court acknowledges that an ALJ's decision "must be based upon consideration of all the relevant evidence," *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994), but, the ALJ did, in fact, consider the MRI results. R. 38. He noted that the remainder of the findings were within normal limits, and also mentioned a subsequent physical examination of Ms. Arevalo, in which objective tests were normal. R. 38.

The ALJ also found Ms. Arevalo's testimony about her daily activities inconsistent with evidence in the record. When the ALJ asked Ms. Arevalo how she spends the hours between when she wakes up and when she falls asleep, she replied, "I watch[] TV." R. 388. In response to a question about her daily routine, she told the ALJ that she does "nothing." R. 387. The ALJ contrasted this testimony with her earlier statements to her physician that she took care of her grandchild. R. 38. The ALJ also pointed to the SSA's daily living questionnaire, where Ms. Arevalo stated that she did "a little cleaning and laundry." R. 114. Ms. Arevalo argues that the ALJ failed to note that she

also stated that her chores only take her an hour each day. R. 114. Even if Ms. Arevalo's chores only required an hour of her day, this fact is inconsistent with what Ms. Arevalo told the ALJ at her hearing. Thus, this aspect of the ALJ's credibility assessment is adequately supported.

Next, the ALJ found that Ms. Arevalo was not entirely compliant with medical advice, which indicated that her symptoms were not as serious as alleged. The ALJ noted that Ms. Arevalo attended seven out of sixteen physical therapy appointments in 2000, and six out of twenty-two in 2001. R. 39. And he found little evidence that Ms. Arevalo received treatment for her symptoms in 2004, 2005, and 2006. R. 39.

Ms. Arevalo does not respond to the Commissioner's argument that the ALJ found that she was noncompliant with her physical therapy program, nor does she address the relatively little treatment she received in 2004, 2005, and 2006. Instead, Ms. Arevalo argues that she sought surgical treatment after her June 2003 MRI, but was unable to undergo surgery, because she could not obtain financial assistance for the treatment through either Workers' Compensation or the Social Security Administration. Social Security Ruling 96-7p forbids an ALJ from drawing "inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record."

Ms. Arevalo contends that her failure to pursue surgical treatment is explained by the record, in which Dr. Michael noted that Ms. Arevalo's surgery was postponed while Ms. Arevalo awaited financial assistance from Workers' Compensation. R. 302.

However, the ALJ did not take issue with Ms. Arevalo's failure to pursue surgical treatment. Instead, his credibility concerns were based on Ms. Arevalo's noncompliance with her physical therapy regimen and her sparse treatment over a three-year period. Ms. Arevalo does not claim that she lacked the financial ability to obtain physical therapy, nor does she point to other explanations in the record for her noncompliance. Ms. Arevalo's argument regarding surgical treatment distorts the issue and ignores the evidence supporting the ALJ's determination.

Finally, the ALJ found Ms. Arevalo to be evasive at her hearing. He points to Ms. Arevalo's statement that she did not recall the amount of Workers' Compensation she received in 2000. Ms. Arevalo argues that it was reasonable for her to not remember a settlement figure from seven years prior. Although the ALJ's opinion that Ms. Arevalo was evasive is debatable, there is no evidence in the record to suggest that this is patently wrong. *Elder v. Astrue*, 529 F.3d at 413 (a reviewing court's role is merely to "examine whether the ALJ's determination was reasoned and supported."). Thus, this finding and those stated above are given substantial deference. Because the ALJ has sufficiently

articulated his reason for discounting Ms. Arevalo's testimony, this Court upholds the ALJ's determination that Ms. Arevalo's testimony regarding the intensity, persistence, and limiting effects of her symptoms is not entirely credible.

## The ALJ's Consideration of Opinion Evidence

Ms. Arevalo argues that the ALJ improperly rejected the opinions of Dr. Ricca, her treating physician, and Dr. Eilers, her consulting physician. A treating physician's "opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (more weight is given to the treating physician's opinion because of his familiarity with the patient). However, Ms. Arevalo is not entitled to disability benefits simply because her physician states that she is disabled or unable to work. *Id.*

A. *Dr. Ricca's Opinion*

In February of 2004, Dr. Ricca wrote a letter to the SSA, stating that, "[a]t this time [Ms. Arevalo] is disabled." R. 298. Eight months later, he wrote, "I believe that she cannot hold any significant job and she is now applying again for disability and I believe she is disabled." R. 297. In his decision, the ALJ gave little weight to Dr. Ricca's opinion because: (1) Dr. Ricca's opinion was not substantiated by objective findings, (2) Dr. Ricca's claim that Ms. Arevalo failed

23

conservative measures was contradicted by other evidence, and (3) Dr. Ricca is not qualified to opine about vocational issues. R. 37.

First, the ALJ found that Ms. Arevalo's limitations were based entirely on her self-reported symptoms, rather than objective evidence. The ALJ observed that, when Dr. Ricca expressed his opinion about Ms. Arevalo's disability, he also noted that her objective findings were normal. R. 39. Also, in his letter from October of 2004, Dr. Ricca characterized Ms. Arevalo's pain as "more of a subjective phenomenon." R. 297. Second, the ALJ noted that he disregarded Dr. Ricca's opinion because Dr. Ricca's characterization of Ms. Arevalo's physical therapy was inconsistent with other evidence. Whereas Dr. Ricca stated that Ms. Arevalo had "failed conservative treatment," the ALJ determined that the evidence showed that Ms. Arevalo was simply "non-compliant with physical therapy." R. 39. The ALJ supported his finding with evidence that Ms. Arevalo regularly missed physical therapy appointments, as well as Dr. Szymke's statement that he was "truly disappointed with her lack of compliance." R. 38-9. Finally, the ALJ added that he gave little weight to Dr. Ricca's opinion that Ms. Arevalo could not work, because the resolution of vocational issues is reserved to the Commissioner pursuant to 20 C.F.R. § 404.1527(e).

Ms. Arevalo calls the ALJ's decision "disingenuous," because Dr. Ricca "is basing his decision on his believability that [Ms.

24

Arevalo] is in pain and that pain would make work impossible."
Pl.'s Mot. Summ. J. 13.   Regardless of whether or not Dr. Ricca
believed Ms. Arevalo was in pain, the ALJ could still reject the
doctor's opinions if those opinions lack objective support and
are inconsistent with other evidence.   *Rice v. Barnhart*, 384 F.3d
363, 371 (7th Cir. 2008) (The ALJ may properly reject a doctor's
opinion if it is based on subjective allegations and not
objective findings.) Ms. Arevalo does not address this, nor any
of the three reasons the ALJ gave in support of his decision to
disregard Dr. Ricca's opinion evidence.   Because Dr. Ricca's
opinions lack objective support and are inconsistent with other
medical evidence, the ALJ was correct to decide that Dr. Ricca's
opinion was not entitled to controlling weight.

    B.   *Dr. Eilers's Opinion*

    On August 29, 2007, Dr. Eilers wrote that Ms. Arevalo could
not work more than four to five hours per day, and required the
ability to sit, stand, and walk at will.   R. 342.   The ALJ found
that Dr. Eilers's opinion was not supported by objective testing,
and that Dr. Eilers's prior opinions about Ms. Arevalo's ability
to work were contradicted by Ms. Arevalo's own actions.   Ms.
Arevalo's sole argument is that the ALJ is "playing doctor."
Pl.'s Mot. Summ. J. 13.

    First, the ALJ noted that Dr. Eilers's physical examination
of Ms. Arevalo revealed she was within normal limits.   R. 38.
Because the ALJ found that Dr. Eilers's opinion was based on

subjective allegations that were unsupported by the objective medical evidence, the ALJ's decision to afford less weight to Dr. Eilers's opinion was appropriate. *Summerlot v. Commissioner of Social Security*, 2009 WL 1766799, at *7 (N.D. Ind. June 23, 2009). The ALJ also considered normal medical findings reported by Drs. Dinh, Szymke, and Snyder. R. 37-8.

Next, the ALJ took into account Dr. Eilers's June 2001 evaluation that he did not see Ms. Arevalo returning to competitive employment. R. 335. Yet, the ALJ points out that in December 2001, Ms. Arevalo did return to work. R. 157. Ms. Arevalo claims that this was an unsuccessful work attempt that lasted only two days due to her back pain. R. 157. However, the ALJ found Ms. Arevalo's statements regarding the intensity and persistence of her ailments not entirely credible, and there is evidence that another doctor believed she should be able to handle the demands of work. In September of 2001, Dr. Szymke recorded his disappointment that Ms. Arevalo missed over 70% of her physical therapy appointments, and noted that her pain must not have been so great if she was skipping treatment. R. 168. His doubts about Ms. Arevalo's reported pain, coupled with Ms. Arevalo's normal test results, prompted Dr. Szymke to release her back to work without restriction. R. 168. As such, Dr. Eilers's opinion was also inconsistent with Dr. Szymke's assessment that she was capable of returning to work.

Further, Ms. Arevalo incorrectly characterizes Dr. Eilers as a treating physician. The record shows that Ms. Arevalo saw Dr. Eilers only three times over seven years. R. 332, 336, 339. Dr. Eilers's records are titled "Evaluations" and addressed to Ms. Arevalo's attorney, presumably in support of Ms. Arevalo's Workers' Compensation and DIB claims. R. 332, 336, 339. Because Dr. Eilers was not Ms. Arevalo's treating physician, he lacks familiarity with Ms. Arevalo and his opinions are not entitled to controlling weight. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("The advantage that a treating physician has over other physicians whose reports might figure in a disability case is that he has spent more time with the claimant."). Even if the Court considered Dr. Eilers a treating physician, the ALJ did not err in minimizing the weight given to his opinion, because it was not supported by objective medical findings. *Dixon v. Massanari,* 270 F.3d at 1178 (stating that the ALJ may reject a doctor's opinion if it appears to be based on a claimant's exaggerated complaints).

**The ALJ's Medical Findings**

Ms. Arevalo argues that the ALJ erred by not considering: (1) other severe impairments; (2) whether the combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (3) additional factors that diminish Ms. Arevalo's ability to perform a full range of sedentary work.

The ALJ may discount medical evidence if it is inconsistent with other evidence in the record. *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (noting that an ALJ must consider all credible medical evidence "unless specific, legitimate reasons constituting good cause are shown for rejecting it").

A.   *Other Severe Impairments*

Ms. Arevalo argues that the ALJ erred by not classifying the following as severe impairments: (1) her bowel and urinary incontinence; (2) her pain in the T-Spine, C-Spine, and L-Spine; and (3) her angina, shortness of breath, mildly enlarged left atrium, and aortic valve sclerosis.

First, Ms. Arevalo argues that the ALJ failed to consider her bowel and urinary incontinence as a severe impairment. The ALJ found that "the claimant's back injury was in her upper spine and the nerves there do not interfere with bladder functioning." R. 41. The ALJ referenced Dr. Snyder's report that Ms. Arevalo's incontinence was only occasional and Dr. Snyder's opinion that the condition was stress-related. R. 38. Ms. Arevalo argues that the ALJ played doctor by "trying to find what for him is a satisfying cause for the incontinence." Pl.'s Mot. Summ. J. 4. The ALJ does not deny that Ms. Arevalo may have suffered from incontinence. Instead, he determined that her incontinence was not as severe as indicated by her testimony. This determination was consistent with his credibility determination, and Dr.

Snyder's assessment that Ms. Arevalo's incontinence was triggered by stress, and not her spinal injury.

Next, Ms. Arevalo argues that the ALJ neglected to consider her continued pain in the T-Spine, C-Spine, and L-Spine. In support of her contention, she cites a single note from an examination by Dr. Dinh in September of 2000. R. 242. As previously discussed, the ALJ found that Ms. Arevalo's testimony about the intensity, persistence, and limiting effects of her pain was not entirely credible. Furthermore, one year after the September 2000 examination cited by Ms. Arevalo, Dr. Dinh acknowledged that he found "no clinical evidence" contradicting Dr. Szymke's finding that Ms. Arevalo's pain is unsupported by objective evidence, and that she is able to return to work. R. 167-69.

Finally, Ms. Arevalo argues that the ALJ failed to consider her cardiac impairments as a severe impairment. She cites her visit to the St. Mary's Hospital emergency room in June of 2003 for chest pain and shortness of breath. R. 268. An echocardiogram reviewed by Dr. Ricca revealed Ms. Arevalo had a mildly enlarged atrium and aortic valve sclerosis. R. 268. However, Ms. Arevalo fails to cite the follow-up examination with cardiologist Dr. Mikell in July of 2003. R. 207. Dr. Mikell concluded that Ms. Arevalo's test was a "false positive" and he did "not see a cardiac explanation of her symptoms." R. 207.

Instead, he recommended that Ms. Arevalo quit smoking, lose weight, and exercise regularly.  R. 207.

Because the ALJ "analyzed the correct criteria and relied on appropriate medical evidence," the ALJ's decision is supported by substantial evidence.  *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447-48 (7th Cir. 2004).

B.  *Whether Impairments Meet or Medically Equal a Listed Impairment*

Ms. Arevalo argues the ALJ erred by not considering whether her impairments met or medically equaled one of the listed impairments.  Specifically, Ms. Arevalo argues that the ALJ did not consult a medical expert at this step, which is required by *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (explaining that "whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue").  The expert can be "one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence."  20 C.F.R. § 404.1526(c).

Here, the ALJ relied on the opinions of the State Agency medical consultants, Dr. Fernando, Dr. Tomassetti, and Dr. Rohs. R. 34-5.  At step three of his analysis, the ALJ determined that Ms. Arevalo's impairments did not meet or medically equal a listed impairment.  The ALJ stated the following:

> No treating or examining physician has indicated
> findings that would satisfy the severity requirements
> of any listed impairment.  In reaching the conclusion

30

that the claimant does not have an impairment or
combination of impairments that medically meet or equal
a listed impairment, I also considered the opinion of
the State Agency medical consultants who evaluated this
issue at the initial and reconsideration levels of the
administrative review process and reached the same
conclusion (20 CFR 404.1527(f) and Social Security
Ruling 96-6p).

R. 35. Thus, the ALJ properly considered a medical expert's
opinion to determine whether Ms. Arevalo's impairments meet an
impairment listed by the Commissioner.

C.    *Additional Factors Affecting Ms. Arevalo's Ability to*
      *Work*

Ms. Arevalo argues that the ALJ did not consider additional
factors that diminished her ability to perform a full range of
sedentary work. They are: (1) her pain as an impairment of her
ability to stay on task for an eight-hour-day; (2) her need to
sit and stand at will; (3) her need for twenty-minute bathroom
breaks each hour; (4) the likelihood she would need to miss work
for medically related reasons; (5) her lack of experience as a
driver; and (6) her problems with moving her hands and fingers.

First, Ms. Arevalo contends that the ALJ disregarded her
pain as an impairment affecting her ability to stay on task for
eight hours of a normal work day. Ms. Arevalo argues that the
ALJ failed to consider the MRI that, according to her, confirmed
her postlaminectomy syndrome. But, as stated above, the ALJ did
consider the MRI results and chose to place greater weight on
other objective findings that showed Ms. Arevalo's abilities were
within normal limits. R. 38. The ALJ also properly considered

and rejected Ms. Arevalo's credibility as to the intensity and persistence of her symptoms.

Second, Ms. Arevalo claims that the ALJ's hypothetical to the VE failed to consider her need to sit and stand at will. Ms. Arevalo relies on Dr. Eilers's opinion that Ms. Arevalo could not work more than five hours per day and would need to sit and stand at will. However, as noted above, the ALJ gave little weight to Dr. Eilers's opinion, and instead relied on the State Agency physicians to determine Ms. Arevalo's ability to perform work. Thus, the ALJ considered Ms. Arevalo's alleged need to sit and stand at will, and deemed it not credible.

Third, Ms. Arevalo argues that the ALJ erred by not considering her need for twenty-minute bathroom breaks each hour. She claims that the ALJ did not fully consider the effects of her incontinence. The ALJ gave no weight to this particular limitation, because it lacked support in the record. He also gave full consideration to Ms. Arevalo's underlying condition of bladder incontinence. As stated above, the ALJ found that Ms. Arevalo's testimony regarding her incontinence was not credible, nor was it substantiated by objective medical findings.

Fourth, Ms. Arevalo argues that the ALJ failed to consider her need for two unexcused absences each week. Ms. Arevalo offers only a single sentence in support of her contention: "The VE testified that there would be no jobs available to someone with such a restriction." Pl.'s Mot. Summ. J. 4. The ALJ gave

little weight to this exchange with the VE, because Ms. Arevalo's need to miss work twice per week was not substantially supported by the evidence. Further, this limitation was only raised by Ms. Arevalo's attorney at the hearing, and not by medical professionals.

Fifth, Ms. Arevalo argues that the ALJ failed to consider her lack of driving experience. In support, Ms. Arevalo offers her testimony that she drives only in emergencies or for short distances. R. 393-94. She also cites her inability to read. R. 394. Ms. Arevalo argues that these limitations should affect how the ALJ weighed the VE's conclusion that Ms. Arevalo could perform work as an escort vehicle driver. However, the ALJ had already discounted Ms. Arevalo's testimony regarding her limitations. Further, there is no evidence demonstrating that Ms. Arevalo's limited driving habits are anything more than her personal preference.

Finally, Ms. Arevalo contends that the ALJ should have considered her hand and finger problems. Ms. Arevalo cites an examination in June of 2000 that noted paresthesias and tingling sensations in her fingers, and Dr. Eilers's 2007 note that she frequently dropped things. R. 188, 340. Yet, the June 2000 examination also noted that Ms. Arevalo's "hand and arm symptoms are infrequent." R. 188. The substantial medical evidence over a seven-year period indicates that these symptoms were rare and limited.

The Court finds that the ALJ correctly determined that substantial evidence did not support the additional limitations put forth by Ms. Arevalo.

## CONCLUSION

For the reasons stated above, the ALJ's denial of Ms. Arevalo's application for DIB is supported by substantial evidence. The Court denies Ms. Arevalo's Motion for Summary Judgment, and grants the Commissioner's Motion for Summary Judgment.

Date: August 24, 2010

E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT